UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN NAYLOR, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:18-cv-01218-JMS-DML |
| WEXFORD HEALTH CARE SERVICES, INC., et al. | ) |
| Defendants. | ) |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DIRECTING FURTHER PROCEEDINGS**

Plaintiff John Naylor, an inmate at Pendleton Correctional Facility, alleges that defendant Dr. Paul Talbot was deliberately indifferent to several of his serious medical conditions. He further alleges that he was denied medical treatment and that his rights were violated pursuant to a policy or practice of defendant Wexford Health Care Services, Inc. ("Wexford").

The defendants filed a motion for summary judgment on April 22, 2019. Dkt. 26. Mr. Naylor responded with a motion for summary judgment on May 16, 2019. Dkt. 37. The defendants replied on May 30, 2019. Dkt. 39.

For the reasons explained below, the defendants' motion for summary judgment, dkt [26], is **granted in part and denied in part**, and Mr. Naylor's motion for summary judgment, dkt. [39], is **denied**.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and

draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.
## Material Facts

Mr. Naylor is incarcerated at the Pendleton Correctional Facility ("Pendleton") in Pendleton, Indiana. Defendant Dr. Paul Talbot is a physician licensed to practice medicine in the state of Indiana. Since April 1, 2017, Dr. Talbot has been employed as a physician at Pendleton by Wexford of Indiana, LLC ("Wexford"), a private company that contracts with the Indiana Department of Correction ("IDOC") to provide medical services to Indiana prisoners. From July 2015 to March 31, 2017, Dr. Talbot was employed as a physician at Pendleton by Corizon, LLC ("Corizon"), the private company that held the healthcare contract with the IDOC before

Wexford. Dkt. 28-1 at 1.

Dr. Talbot has been one of Mr. Naylor's primary care providers since July 2015. Mr. Naylor's complaint raises several separate incidents of alleged deliberate indifference. Specifically, he alleges the following:

A. He has disconnected muscles in his leg that have been left untreated and he was denied physical therapy for the disconnected muscles;
B. He has been deprived of medical shoes and custom arch supports for plantar fasciitis, bone alignment, joint alignment, and heel spurs;
C. He was denied a referral to a plastic surgeon to repair his lip so that he will not bite it while eating;
D. His Imodium was switched from Keep on Person ("KOP") to Directly Observed Therapy ("DOT") and his dosage was reduced;
E. His Zantac was downgraded to Pepcid;
F. He was denied the MRI and CT monitoring that he requested due to prior head trauma; and
G. Wexford maintains a policy or practice of denying medical treatment in order to save money.

Dkt. 1.

### A. Disconnected Muscles

On July 26, 2015, Mr. Naylor sustained injuries when he was assaulted by another inmate. Dkt. 28-1 at 2. He was transported to St. Vincent Hospital in Anderson, Indiana by ambulance. Dkt. 35 at 5. Injuries from the assault included a large laceration to his left upper lip and a broken right ankle. *Id*. at 8.

While at St. Vincent, Mr. Naylor's right wrist and ankle were x-rayed. There was no fracture to the wrist, but his ankle was broken in multiple places. No tissue, muscle, or ligament damage was noted. Hospital staff immobilized the ankle by applying a splint. The hospital physicians recommended follow-up with an orthopedic surgeon within 2-3 days for further evaluation. Dkt. 35 at 8. The next morning, Dr. Talbot submitted an urgent request for Mr Naylor to be scheduled for an appointment with an orthopedist. Dkt. 35 at 27.

The lip laceration was sutured at the hospital. Other than removing the sutures, there was no recommendation for further evaluation of the lip laceration made by the hospital physician. Dkt. 35 at 8.

On August 25, 2015, Dr. Kaehr, an outside orthopedic surgeon, determined that Mr. Naylor required surgical repair of the ankle fracture. Dkt. 35 at 39. Dr. Kaehr performed surgery on Naylor's right ankle on September 3, 2015, and performed a post-operative follow-up exam on October 27, 2015. Dkt. 35 at 48, 60. During the exam, Dr. Kaehr noted that the incision was well healed and removed the surgical staples. Dkt. 35 at 60. Dr. Kaehr supplied Mr. Naylor with a removable walking cast. Dr. Kaehr instructed Mr. Naylor to wear the walking cast at all times while weight-bearing but noted that he could remove it while showering and sleeping. Dr. Kaehr recommended follow-up to have the surgical screws removed. *Id*.

On December 10, 2015, Dr. Kaehr evaluated Mr. Naylor, removed the surgical screws from the right ankle, and requested that the sutures from the screw removal be removed in 10-14 days. Dr. Kaehr also obtained an x-ray of Naylor's right ankle, which indicated that the fracture was healed. Because the fracture had healed, Dr. Kaehr recommended that Mr. Naylor resume normal activities and bear his full weight on his right foot without the walking cast. Dr. Kaehr noted that no further follow-up was needed. Dkt. 35 at 77. None of Dr. Kaehr's records indicate that Mr. Naylor had disconnected muscles that would require future repair or rehabilitation. Dkt. 28-1 at 4. However, Mr. Naylor contends that Dr. Kaehr told him that not all of his muscles were reconnected during surgery and that hopefully his body would compensate. Dkt. 38 at 5.

Since being released from Dr. Kaehr's care in December 2015, Dr. Talbot reports that Mr. Naylor has been able to walk without difficulty, perform daily activities, and participate in recreation. *Id*. Mr. Naylor does not dispute this, although he states that he is not ok and that he

has been told he will likely have arthritis and have to use a cane in the future. Dkt. 38 at 5-6.

### B. Irritable Bowel Syndrome & Acid Reflux

On July 15, 2015, Dr. Talbot evaluated Mr. Naylor for complaints of abdominal pain. Dkt. 28-1 at 4-5. Mr. Naylor reported a 10-year history of Irritable Bowel Syndrome ("IBS") relieved by loperamide (aka "Imodium"), which he had been out of for approximately 30 days. Dkt. 35 at 1. IBS is a chronic disorder of the large intestine that requires routine monitoring and medication management. Signs and symptoms of IBS include abdominal cramping and pain, bloating, gas, and diarrhea or constipation, or both. Imodium is an anti-diarrheal drug. Dkt. 28-1 at 4-5. Medical records reflect that, despite being out of his medication for a month, Mr. Naylor denied that his symptoms had worsened. Dkt. 35 at 1.

Mr. Naylor also reported a history of gastroesophageal reflux disease ("GERD"), which is a disease of the digestive system where stomach acid irritates the esophagus. Dkt. 28-1 at 4-5. Mr. Naylor reported that his GERD symptoms were controlled with Zantac (an antacid and antihistamine). Dr. Talbot continued Mr. Naylor on Zantac and Imodium and enrolled him in the Chronic Care Clinic ("CCC") for IBS. Inmates in the chronic care clinic are evaluated every 90-180 days, depending on the condition. Mr. Naylor had previously been enrolled in the CCC for GERD. *Id.*

#### 1. Imodium

In July 2016, Dr. Talbot changed Mr. Naylor's Imodium prescription from "KOP," which means "keep on person," to "DOT," which means "directly observed therapy." Dkt. 28-1 at 5. Patients with DOT drugs can only receive their medications through nursing staff. *Id.* Patients with KOP drugs are permitted to keep their medications in their cell and take as prescribed by the physician. *Id.* On September 16, 2016, Mr. Naylor submitted an informal grievance to the

medical department claiming that DOT medication interferes with his REM sleep and circadian rhythms. Dkt. 34 at 89.

The decision to switch Imodium prescriptions from KOP to DOT for all inmates was made after Dr. Talbot discussed the issue with his colleagues at Corizon. Dkt. 28-1 at 5. They decided that, under most circumstances, Imodium should no longer be prescribed KOP across the patient population because it can it can create a high similar to that experienced with opioids when taken in high doses which can lead to fatal cases of dehydration and heart arrythmias. For these reasons, Dr. Talbot and his colleagues agreed that Imodium should be prescribed in the prison setting as DOT, in order to monitor the administration of the drug and ensure patients are taking the medication as prescribed. There is no clinical reason for Imodium to be prescribed KOP. *Id*.

Mr. Naylor receives 4 mg of Imodium twice per day via nursing staff. *Id*.; Dkt. 38 at 6. Dr. Talbot contends that Mr. Naylor continues to report good control of his symptoms. Dkt. 28-1 at 5. But Mr. Naylor attests that Dr. Talbot reduced his prescription from six Imodium pills per day to two and that whenever he asks for more, Dr. Talbot tells him no. Dkt. 38 at 6-7. He also states that Dr. Talbot refuses to discuss other medications that may work better and that Dr. Talbot blames the pharmacy. These assertions indicate that Mr. Naylor does not believe his symptoms are adequately managed by his current prescription.

   2. Zantac

In the fall of 2017, the pharmacy removed Zantac from the formulary and added Pepcid for the treatment of GERD symptoms. Dkt. 28-1 at 6. Thereafter, Dr. Talbot prescribed Pepcid for Mr. Naylor's GERD condition. Histamine-2 blockers ("H2s") are drugs that reduce the amount of gastric acid produced by the stomach. H2s are often used in the management of GERD.

Ranitidine, the generic form of Zantac, and famotidine, the generic form of Pepcid, are both H2s. Zantac and Pepcid are different drugs chemically, but they both operate to reduce stomach acid. *Id*.

Mr. Naylor's Pepcid is prescribed as KOP. Dr. Talbot states that Mr. Naylor has reported good control of GERD symptoms on Pepcid and there is no clinical reason to switch Mr. Naylor back to Zantac. *Id*. Mr. Naylor contends that Pepcid does not control his symptoms as well as Zantac did and that he is left vomiting acid which will scar his esophagus creating a risk of cancer. Dkt. 38 at 7-8.

### C. Arch Supports and Medical Shoes

Mr. Naylor wore medical shoes (aka "orthotic shoes") prior to his incarceration. There is no indication that he has had orthotic shoes while incarcerated. Dkt. 28-1 at 6. He did not have orthotic shoes prescribed when Dr. Talbot became one of his treating physicians in 2015. It is Dr. Talbot's opinion that there is no clinical reason for Mr. Naylor to wear orthotic shoes because Mr. Naylor does not have an exaggerated alignment issue that would necessitate orthotic shoes with a heel lift. *Id*.

Mr. Naylor also claims to have plantar fasciitis and heel spurs. *Id*. Dr. Talbot agrees that Mr. Naylor has signs and symptoms compatible with plantar fasciitis, but Mr. Naylor has not been diagnosed with heel spurs. Mr. Naylor has been prescribed orthotic shoe inserts (or "arch supports") while incarcerated for his plantar fasciitis. *Id*. at 6-7.

On July 18, 2016, Dr. Talbot evaluated Mr. Naylor in the Chronic Care Clinic for IBS and GERD. *Id*. at 7. During that visit, Mr. Naylor also complained of foot pain and Dr. Talbot ordered arch supports for his shoes for symptoms of plantar fasciitis. *Id*.

On December 15, 2016, Mr. Naylor submitted a Request for Healthcare ("RFHC")

form complaining that the surgical scars on both sides of his ankle caused friction while walking in his commissary boots. Dkt. 34 at 24. He requested to see a podiatrist to "get [him] boots capable of dealing with [his] unique needs." *Id*. He further complained of an "arch issue." *Id*. On December 17, 2016, nursing staff met with Mr. Naylor in response to the RFHC form he submitted. *Id*. at 25-26. Nursing staff provided him with an Ace bandage for support and noted that a routine follow-up appointment with the provider had been scheduled. *Id*.

On January 30, 2017, Dr. Talbot evaluated Mr. Naylor in the Chronic Care Clinic for IBS and GERD. Dkt. 24 at 30. During the visit, Mr. Naylor complained that the scar on his right ankle rubbed his boots and stated that he thought orthotics would help with the discomfort. He also complained of foot pain that was compatible with plantar fascial pain. On exam, Mr. Naylor's gait was normal and there was no foot deformity and no tenderness upon palpation. It was Dr. Talbot's opinion that there was no need for orthotic shoes. Dkt. 28-1 at 7-8. Had orthopedic shoes been provided only for the convenience of preventing his scars from rubbing on his boots, the shoe would have elevated his right hip, potentially leading to pain in the hip or lower back. *Id*. Dr. Talbot ordered another pair of arch supports for the plantar fascial pain. *Id*. at 8. Mr. Naylor received them on February 6, 2017. *Id*. It is Dr. Talbot's understanding that Naylor returned the size 13 shoe inserts because he needed a different size. *Id*.

On February 21, 2017, Dr. Talbot evaluated Mr. Naylor for complaints of foot pain and worn shoe inserts. Dkt. 34 at 39. Dr. Talbot noted wear on the shoe inserts. *Id*. Dr. Talbot requested custom arch supports, but this request was denied and commissary arch supports were recommended as an alternative. Dkt. 28-1 at 8. According to Mr. Naylor, the commissary does not sell the specific type of arch support he wanted. *Id*. Dr. Talbot states that he was not involved in Mr. Naylor's care again until June of 2017 and was not aware that Mr. Naylor was having

trouble obtaining the proper arch supports. *Id*.

On March 9, 2017, Nurse Practitioner ("NP") Murage evaluated Mr. Naylor. Dkt. 34 at 47-50. NP Murage noted that Dr. Talbot's previous request for shoe inserts had been denied and an alternative treatment plan had been recommended. Mr. Naylor explained that he had surgery on his right ankle in 2015 and that some of the surgical screws and a plate were left in place after surgery. He complained that he could feel the plate pressing on the muscles causing sharp pain in his ankle and causing alignment problems. He believed the alignment issues caused dull aches in his lower back, both knees and hips. On exam, his gait was steady and he was able to heel-toe walk. He had pain-free range of motion. NP Murage ordered an x-ray to look at the hardware that remained in Naylor's right ankle, given his complaints. *Id*.

On March 21, 2017, NP Murage evaluated Mr. Naylor in the Chronic Care Clinic for GERD and IBS. *Id*. at 55-58. She also discussed the results of the right ankle x-ray taken on March 9, 2017, explaining that the x-ray findings did not indicate a need for specialized shoes. *Id*. at 55.

On July 10, 2017, nursing staff assessed Mr. Naylor in response to an RFHC related to a spot on his back that he believed could be an infection and a request for arch supports for plantar fasciitis. *Id*. at 63-65. NP Murage ordered custom arch supports and Mr. Naylor received them on August 10, 2017. *Id*. at 66-67. There is no indication in the medical records that Mr. Naylor has complained of a need for arch supports since August 10, 2017. Dkt. 28-1 at 9. However, Mr. Naylor contends that he explained to Dr. Talbot that commissary did not have his size of arch support. He also attests that Nurse Patrick eventually got him non-custom insoles in the correct size, but that they did not work. He repeatedly brought up the issue at chronic care visits with Dr. Talbot, but Dr. Talbot did not record Mr. Naylor's complaints in the medical records. Dkt. 38 at

9-10.

### D. Lip Surgery

On July 26, 2015, Mr. Naylor received sutures at St. Vincent Hospital after he was stabbed in the face by another inmate. Dkt. 28-1 at 9. The wound healed in such a way that it causes Mr. Naylor to bite his lip more often than most people. Dkt. 38 at 11-12. He states that Dr. Buller told him that Dr. Buller had a similar condition and had his surgically repaired. *Id*. Dr. Talbot was not present during this conversation. Dkt. 28-1 at 9.

On October 21, 2016, Mr. Naylor submitted an informal grievance complaining that Dr. Buller denied his request for referral to a plastic surgeon to repair his lip. Dkt. 34 at 23. Mr. Naylor believes that Dr. Buller denied his request for referral to a plastic surgeon in order to "fall in line" with Dr. Talbot. Dkt. 38 at 11-12

Dr. Talbot does not recall Mr. Naylor reporting a problem with his lip after his initial injury in July 2015, and there is no indication of such a complaint in his medical record. Dkt. 28-1 at 9. Dr. Talbot has evaluated Mr. Naylor many times over the last four (4) years and sees no clinical reason for surgical revision of the lip scar. *Id*.

### E. Head Injury

Mr. Naylor contends that he has a history of concussions and was told by a counselor at Abilene Christian University that another concussion could kill him. He was also told by a doctor that he suffers from Encephalopathy. He reports that prison medical staff said his pupils were growing and shrinking intermittently after he was attacked on July 26, 2015. Dkt. 38 at 12-13. Given this history, Mr. Naylor requested an MRI or CT scan of his head.

Dr. Talbot does not recall Mr. Naylor reporting previous head trauma and there is no indication of such a complaint in his medical records. Dkt. 28-1 at 10. MRI and CT imaging

are used to diagnose an acute condition. They are not used for surveillance after an acute injury has been diagnosed, unless the patient begins to present with signs and symptoms of an acute issue. *Id*. Mr. Naylor has not reported symptoms of an acute neurological issue that would necessitate an MRI or CT scan of the brain. *Id*. Furthermore, MRI and CT scans emit a significant amount of dangerous radiation and they are to be used only when indicated and not for unnecessary surveillance. *Id*.

Since 2015, Mr. Naylor has not presented with any signs of brain damage and there is no indication that he is at risk for long-term brain damage from his history of head trauma. *Id*.

### F. Policy Claim against Wexford

Dr. Talbot attests that Wexford does not have a policy, custom, or practice intended to deny, delay, or downgrade patient care within the IDOC. Dkt. 28-1 at 10. Mr. Naylor argues that the medical records provide evidentiary support for his policy claim. Dkt. 38 at 22.

## III.
## Discussion

Mr. Naylor alleges that the defendants Dr. Talbot and Wexford are liable because they were deliberately indifferent to his serious medical conditions.4Pursuant to the Eighth Amendment, prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate that (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the condition but was deliberately indifferent to the substantial risk of harm it posed. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"To infer deliberate indifference on the basis of a physician's treatment decision, the

decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 766, 730-31 (7th Cir. 2016).

In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id*.

### A. Disconnected Muscles

The parties do not dispute that Mr. Naylor's broken ankle was a serious medical condition or that he received surgery and follow-up care to treat the broken ankle. Although Mr. Naylor contends that the surgeon told him that the normal wait time for surgery was a week and a half and that the surgeon was unable to reattach all of his muscles during surgery, the evidence shows that Dr. Talbot placed an urgent request that Mr. Naylor be seen by an orthopedist the day after he was injured. Mr. Naylor has provided no evidence that either the delay in surgery was caused by Dr. Talbot or that the outcome of the surgery would have been different if it had been

performed earlier.

Dr. Talbot attests that Mr. Naylor is able to walk and participate in daily activities, including recreation. Dkt. 28-1 at 4. Mr. Naylor does not dispute these assertions in his motion for summary judgment. At most, he states that he may develop arthritis and require a cane in the future. Dkt. 38 at 6. Mr. Naylor has not provided any evidence that his condition is currently a serious medical condition, that it could be repaired, or that he requires physical therapy.

Even assuming disconnected muscles after surgery is a serious medical condition, Dr. Talbot is entitled to summary judgment on this claim because there is no evidence that he was deliberately indifferent to Mr. Naylor's muscles, that he took any action that caused the surgeon to be unable to reconnect some of Mr. Naylor's muscles, or that Mr. Naylor currently requires medical treatment.

### B. Imodium

Mr. Naylor has previously litigated and lost in another case the question of whether Dr. Talbot's decision to switch his Imodium from KOP to DOT constituted deliberate indifference. *See Naylor v. Paul Talbot*, Cause No. 1:17-cv-02380-JPH-TAB, dkt. 45. Dr. Talbot is therefore entitled to summary judgment on that claim.

The parties dispute, however, whether Mr. Naylor's current dose of 4 mg of Imodium twice per day is effectively treating his IBS symptoms. Dr. Talbot states that Mr. Naylor reports good control of symptoms, while Mr. Naylor states that when he tells Dr. Talbot the smallest dose that would be effective, Dr. Talbot responds that the plaintiff wants too high a dose. This dispute of material fact means that neither party is entitled to summary judgment on the claim that Dr. Talbot was deliberately indifferent to Mr. Naylor's need for Imodium to treat his IBS symptoms.

### C. Zantac

The parties dispute whether Mr. Naylor's Pepcid prescription is as effective at treating his GERD symptoms as his former Zantac prescription. Dr. Talbot contends that Mr. Naylor has reported that Pepcid controls his symptoms and there is no clinical reason to switch him back to Zantac. *Id*. Mr. Naylor contends that Pepcid does not control his symptoms as well as Zantac did and that he is left vomiting acid which may scar his esophagus creating a risk of cancer. Dkt. 38 at 7-8. This dispute of material fact means that neither party is entitled to summary judgment on Mr. Naylor's claim that Dr. Talbot is deliberately indifferent to Mr. Naylor's need for Zantac to treat his serious medical condition, GERD.

### D. Arch Supports and Medical Shoes

Mr. Naylor asserts that the hardware in his ankle and plantar fasciitis make it painful to wear prison-issued boots. Dr. Talbot testified that an orthopedic shoe with a wedge to lift Mr. Naylor's heel would likely cause him hip pain because it would cause misalignment in his hips. Mr. Naylor attests that an order allowing him to wear athletic shoes instead of the required boots would alleviate the pain from the hardware in his ankle.

The parties agree that Mr. Naylor has signs and symptoms compatible with plantar fasciitis, and that Dr. Talbot ordered arch supports for him. The parties dispute whether Dr. Talbot was aware that Mr. Naylor had trouble getting the correct size of arch supports from commissary. If Mr. Naylor alerted Dr. Talbot to the problem, and Dr. Talbot did nothing, as Mr. Naylor attests, a jury could find that Mr. Naylor's plantar fasciitis pain constitutes a serious medical condition and that Dr. Talbot acted with deliberate indifference to that pain. This dispute of material fact means that neither party is entitled to summary judgment on the question of whether Dr. Talbot was deliberately indifferent to Mr. Naylor's plantar fasciitis and pain caused

by the hardware in his ankle.

### E. Lip Surgery

The parties do not dispute that Dr. Talbot has not provided any treatment for Mr. Naylor's complaint that the way his lip has healed from his stab wound causes him to bite his lip on a weekly or daily basis. The parties dispute whether the surgery Mr. Naylor requests for his lip is purely cosmetic or would alleviate a serious medical condition. A condition is considered a serious medical condition if "a reasonable doctor or patient would find important and worthy of comment or treatment" or if it "significantly affects an individual's daily activities." *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)). A jury could find that Mr. Naylor's chronic lip biting interferes with his ability to eat without pain and therefore constitutes a serious medical condition. This dispute of material fact means that neither party is entitled to summary judgment on the claim that Dr. Talbot is deliberately indifferent to Mr. Naylor's need for lip surgery by failing to request that he be approved for examination by an outside specialist.

### F. Head Injury

It is undisputed that Mr. Naylor requested an MRI or CT scan because he has a history of concussions. Nor is it disputed that since his assault in 2015, he has not presented with any signs or symptoms of an acute neurological issue that would require an MRI or CT scan. Mr. Naylor presents no evidence from which a jury could conclude that he suffered from a serious medical brain condition and that Dr. Talbot was deliberately indifferent to that condition. Therefore, Dr. Talbot is entitled to summary judgment on the head injury claim.

### G. Policy Claim Against Wexford

Because Wexford acts under color of state law by contracting to perform a government

function, i.e. providing healthcare services to inmates, it is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). "[M]unicipal governments [including counties] cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional municipal policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)).

For Mr. Naylor to succeed on his policy claim, the Court must determine that Wexford had a policy or custom that caused a constitutional injury. "The critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379 (citing *Monell,* 436 U.S. 658 (1978) and *Los Angeles Cnty. v. Humphries,* 562 U.S. 29 (2010)). "Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Id.*

Dr. Talbot attests that Wexford does not have a policy, custom, or practice intended to deny, delay, or downgrade patient care within the IDOC. Dkt. 28-1 at 10. But the medical records demonstrate that Mr. Naylor was not scheduled to see an orthopedist for approximately one month despite recommendations from emergency room staff and a request by Dr. Talbot that he be scheduled to see an orthopedist within 2-3 days of his injury. Dr. Talbot's request for custom arch supports for Mr. Naylor was denied. Dkt. 28-1 at 8. And Mr. Naylor attests that Dr. Talbot blamed the pharmacy for his inability to prescribe other, potentially more effective medications. Dkt. 38 at 7. Combined, this evidence is sufficient to maintain a policy or practice claim against Wexford that it denies or delays medical treatment to save money. The parties

dispute whether Wexford maintains such a policy or practice. Therefore, neither party is entitled to summary judgment on this issue.

## IV. Conclusion

For these reasons, the defendants' motion for summary judgment, dkt [26], is **granted in part** as to Mr. Naylor's claims that Dr. Talbot was deliberately indifferent to disconnected muscles in his ankle and to his request for an MRI or CT scan of his head, and **denied in part** as to Mr. Naylor's remaining claims. No partial summary judgment shall issue at this time. Mr. Naylor's motion for summary judgment, dkt [37], is **denied** because material issues of fact prevent summary disposition of his remaining claims.

The following claims are proceeding in this action:

- Eighth Amendment claims that Dr. Talbot is deliberately indifferent to Mr. Naylor's foot pain, need for lip surgery, and symptoms of GERD and IBS.

- An Eighth Amendment claim that Wexford maintains a policy or practice of delaying or denying effective medical treatment to save money.

Although the Court has previously determined that Mr. Naylor is competent to litigate this action, *see* dkt. 42, it is the Court's preference that he be represented by counsel for trial or any potential settlement conference. Therefore, the Court will attempt to recruit counsel to represent him. Mr. Naylor shall have **through December 31, 2019,** in which to notify the Court if he objects to the recruitment of counsel on his behalf. After counsel is appointed for Mr. Naylor, **the Magistrate Judge is requested** to set this matter for a status conference to discuss what further development is necessary for trial and if the case is amenable to settlement.

**IT IS SO ORDERED.**

Date: 12/9/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

JOHN NAYLOR
128761
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Britney Jade McMahan
KATZ KORIN CUNNINGHAM, P.C.
bmcmahan@kkclegal.com


Magistrate Judge Debra McVicker Lynch